703 F.2d 1019
 TELEGRAPH SAVINGS AND LOAN ASSOCIATION, et al., Plaintiffs-Appellants,
v.
William J. SCHILLING, et al., Defendants-Appellees.
TELEGRAPH SAVINGS AND LOAN ASSOCIATION, et al., Plaintiffs-Appellants,
v.
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, Federal Home
Loan Bank Board and William J. Schilling,
Defendants-Appellees.
 Nos. 80-2012, 82-1635, 82-1702 and 82-1457.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 9, 1982.
Decided March 29, 1983.
Rehearing and Rehearing En Banc Denied May 12, 1983.
 
 Daniel J. O'Connor, James G. Staples, Francis D. Morrissey, Thomas A. Doyle, Gerald L. Maatman, Jr., William Lynch Schaller, Baker & McKenzie, Chicago, Ill., for plaintiffs-appellants.
 John L. Rogers, III, Roger P. Flahaven, Asst. Atty. Gen., Dan K. Webb, U.S. Atty., William T. Clabault, Asst. U.S. Atty., Chicago, for defendants-appellees.
 Before BAUER, COFFEY, Circuit Judges, and HOFFMAN, Senior District Judge.*
 BAUER, Circuit Judge.
 
 
 1
 In this appeal Telegraph Savings & Loan Association (Telegraph) challenges its closure by the Illinois Commissioner of Savings and Loan Associations (Commissioner), the appointment of the Federal Savings & Loan Insurance Corporation (FSLIC) as receiver and the subsequent sale of Telegraph's assets to First Federal Savings & Loan Association. The district court held that the takeover and sale were proper. We affirm.
 
 
 2
 Telegraph was an Illinois chartered savings and loan association owned by one hundred and twenty stockholders and insured by the FSLIC. In the late 1970's Telegraph began experiencing financial difficulties. As a result of heavy losses, it was unable to satisfy the reserve and net worth minimums required by 12 C.F.R. Sec. 563.13. When Telegraph's financial condition continued to decline at an ever-increasing rate, the state and federal officials charged with regulating savings and loan associations became alarmed. A special meeting was held in October, 1979, to identify the cause of Telegraph's decline and to propose some solutions. Telegraph's Board of Directors and representatives of the Commissioner, the FSLIC and the Federal Home Loan Bank Board (FHLBB) attended. At this meeting the Commissioner concluded that undercapitalization was causing Telegraph's shaky financial condition and indicated that, unless this situation was remedied, the state would have to assume custody.
 
 
 3
 Additional meetings were held in 1979 and 1980 to monitor Telegraph's financial status and to develop a plan for infusing Telegraph with new capital. Possible mergers were considered but only one concrete plan surfaced. The Heron Corporation offered to purchase 80% of Telegraph's preferred stock if the FSLIC would finance the purchase with a fifteen-year interest free loan.[1] The FHLBB vetoed the Heron Proposal.
 
 
 4
 When no other buyers came forward, the Commissioner and federal officials concluded that they had no choice but to take control. A takeover plan was devised whereby the Commissioner would assume custody of Telegraph and FHLBB would immediately appoint the FSLIC receiver. The FSLIC, in turn, would immediately transfer Telegraph's assets to First Federal Savings & Loan Association under a purchase and assumption agreement.
 
 
 5
 According to this prearranged plan, the takeover was effected on May 22, 1981 at Telegraph's main office. Just before the usual closing time the Commissioner served Telegraph's president with a notice that the state was assuming immediate custody. The notice explained that Telegraph's financial instability had created an emergency situation which necessitated the takeover. Telegraph had not received prior written notice of this decision.[2] After serving the president with the notice, the Commissioner sent his deputy to the teller's window where one of Telegraph's customers, A. Raymond Bacon, was waiting to withdraw twenty-five dollars. Bacon was making the withdrawal solely because the FHLBB had requested him to do so. When Bacon approached the teller, the deputy intervened. He took the withdrawal slip from Bacon and handed it, along with an affidavit stating that Bacon had been unable to withdraw his money, to the FHLBB agent. The purchase and assumption agreement was executed immediately, and the next day Telegraph's operation opened under First Federal's name.
 
 
 6
 Telegraph then filed identical actions challenging the takeover and the appointment of the FSLIC as receiver in the federal court for the Northern District of Illinois and in the state court in the Circuit Court of Cook County. The federal action was assigned to Judge Grady. The state action was removed to federal court and assigned to Judge Marshall. Judge Marshall held that federal courts have exclusive jurisdiction over any action to remove the FSLIC as receiver and concluded that, since the state court never had jurisdiction over the action, it had no authority to remove it to federal court. Declining to grant Telegraph's request to remand back to the state court, Judge Marshall dismissed the action. Telegraph appealed to this court.
 
 
 7
 Telegraph also filed a new state court action, this time proceeding against the Commissioner but not the federal agencies. The state court, relying on Judge Marshall's opinion that federal courts have exclusive jurisdiction, dismissed that action. Telegraph appealed this dismissal; that appeal is currently pending in the state court.
 
 
 8
 The central issue in the case proceeding before Judge Grady was whether the requirements for appointment of an FSLIC receivership, set forth in 12 U.S.C. Sec. 1729(c)(2) had been satisfied. Section 1729(c)(2) provides that the FHLBB has the authority to appoint the FSLIC receiver over a state savings and loan institution whenever it determines:
 
 
 9
 (A) that ... (ii) an insured institution has been closed by or under the laws of any State; and
 
 
 10
 (B) that one or more of the grounds specified in paragraph (6)(A) of section 1464(d) of this title, existed with respect to such institution at the time a conservator, receiver, or other legal custodian was appointed, or at the time such institution was closed ...; and
 
 
 11
 (C) that one or more of the holders of withdrawable accounts in such institution is unable to obtain a withdrawal of his account, in whole or in part; ....
 
 
 12
 12 U.S.C. Sec. 1729(c)(2). Judge Grady concluded in response to defendants' motion for summary judgment that subsections (A) and (C) had been satisfied.
 
 
 13
 Thereafter a bench trial was held on the issue of whether subsection (B) had been satisfied. The FHLBB argued that applying the statutory test of insolvency, which is whether the "assets of the association are less than its obligations to its creditors and others ...," 12 U.S.C. Sec. 1464(d)(6)(A)(i), Telegraph had been insolvent at the time of the appointment. Therefore, the FHLBB contended, section 1729(c)(2)(B) had also been fulfilled. Judge Grady agreed and entered judgment in favor of defendants.
 
 
 14
 On appeal Telegraph assigns numerous errors. It argues that the district court erred in granting partial summary judgment because the trial judge erroneously refused to consider state law issues which raised questions of material fact precluding summary disposition. It also asserts that subsections (A) and (C) cannot be satisfied by a prearranged closing orchestrated in tandem by state and federal authorities because such joint action subverts the purpose of the statute. With respect to the trial, Telegraph asserts that the finding that Telegraph was insolvent must be reversed because: (1) the statutory test of insolvency is unreliable and irrational; (2) highly relevant evidence was improperly excluded; and (3) the judge did not accord proper weight to the testimony of Telegraph's primary witness. Judge Marshall's dismissal of the action removed from state court is also part of this appeal, as are numerous rulings relating to Counts I, II, IV, VI, IX and X.
 
 
 15
 Before analyzing Telegraph's contentions, we note that Telegraph attempts to support its position with a myriad of arguments, some of which are unsupported by legal authority. Because many of these arguments were raised, fully analyzed, and properly rejected by the trial judge in four extensive memorandum opinions, Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp., No. 80 C 2792, slip ops. (N.D.Ill. Mar. 18, 1982; Feb. 19, 1982; Aug. 4, 1981; June 9, 1981), we confine our analysis to those arguments which are dispositive of this appeal.
 
 
 16
 * A basic understanding of the federal statutory scheme is essential to an analysis of the technical issues and specific sections involved here. The National Housing Act, 12 U.S.C. Sec. 1701 et seq. created the FSLIC, under the direction of the FHLBB, to insure both federal and state savings and loan associations. 12 U.S.C. Sec. 1725(a). When the statute was first enacted, the FSLIC could become receiver for a state savings and loan association only if the state requested its appointment. The FHLBB did not have independent authority to appoint the FSLIC as receiver for a state institution. 12 U.S.C. Sec. 1729(c)(1).
 
 
 17
 Under section 1729(c)(1), the FSLIC was obligated to make insurance payments when a state association failed, even in situations where the state had refused to appoint the FSLIC as receiver, and, thus had deprived it of any voice in the liquidation process. For this reason, in 1968, after several state associations had failed and state authorities had refused to appoint the FSLIC receiver, the statute was amended to provide for greater federal control. Senate Report No. 1263, 90th Cong., 2d Sess., reprinted in 1968 U.S.CODE CONG. & AD.NEWS 2530, 2534. Section 1729(c)(2) was added, granting the FHLBB independent authority to appoint the FSLIC receiver for a state institution regardless of whether the state requested the appointment, whenever certain statutory requirements, enumerated in 12 U.S.C. Sec. 1464(d), were satisfied.
 
 
 18
 The difference between a situation where the state appoints the FSLIC receiver and one where the FHLBB appoints the FSLIC receiver is the type of judicial review available. A section 1729(c)(1) receivership, where the receiver is appointed by the state commissioner acting pursuant to state law, can be challenged in state court. In contrast, where the FHLBB, acting on its own, appoints the FSLIC receiver the challenge to that receivership can be raised only in federal court. 12 U.S.C. Sec. 1464(d)(6)(A).
 
 A. The Closing "By or Under" State Law
 
 19
 Telegraph characterizes the takeover orchestrated jointly by state and federal officials as a sham procedure because it created a receivership which could be challenged only in federal court. It emphasizes that if the Commissioner had assumed custody and appointed the FSLIC receiver without acting in conjunction with federal authorities, the Commissioner's finding of an emergency situation justifying the takeover without prior written notice could have been challenged in state court.[3] Because the FHLBB, rather than the state, appointed the FSLIC receiver, however, Telegraph was restricted to challenging the action in federal court. And because the district court held that the issue of whether Telegraph was closed in compliance with state law was irrelevant to the issue of whether the FHLBB properly determined that Telegraph was insolvent under 12 U.S.C. Sec. 1464(d), Telegraph claims that it was caught in a "jurisdictional gap between the state and federal spheres, leaving [Telegraph] without a forum." Appellant's br. at 31. As a result of this "jurisdictional gap," Telegraph complains there is no court where the issue of whether the Commissioner acted in compliance with state law can be raised.[4]
 
 
 20
 The district court, relying on S.Rep. No. 1263, 90th Cong., 2d Sess., reprinted in 1968 U.S.CODE CONG. & AD.NEWS 2530, 2534, rejected Telegraph's argument. It reasoned that Congress drafted section 1729(c)(2) purposely to limit challenges to FSLIC's appointment by the FHLBB to the federal courts because it intended the FHLBB's conduct to be evaluated under uniform federal law. Thus, the district court held that the closure requirement of section 1729(c)(2)(A) is met whenever an institution is closed by state officials. Because no party disputed that Telegraph was closed by state officials on May 22, the district court held that the closure requirement had been satisfied.
 
 
 21
 Citing no authority supporting its position, Telegraph would have us believe that it is always entitled to challenge a FSLIC receivership in state court. Neither the statutory language nor the legislative history supports Telegraph's contention. Section 1729(c)(2)(A)(ii) requires that "an insured institution has been closed by or under the laws of any State." 12 U.S.C. Sec. 1729(c)(2)(A)(ii). The closing "by or under" state law triggers the FHLBB's authority. No language in this section requires the FHLBB to evaluate whether or not the closing was in compliance with state law. Our interpretation is supported by S.Rep. No. 1263, which states that Congress amended section 1729(c) in order to safeguard the financial integrity of the FSLIC and "to enable the FSLIC to defend its appointment under federal law instead of requiring it to defend the legality of the State savings and loan administrator's determinations under State law." S.Rep. No. 1263, 90th Cong., 2d Sess., reprinted in 1968 U.S.CODE CONG. & AD.NEWS 2530, 2540.
 
 
 22
 The fact that the receivership must be challenged in federal court instead of state court, however, does not deprive Telegraph of effective judicial review. While the statute, as amended, makes no provision for reviewing actions of the state authorities, it does provide for a full review of whether the FHLBB was justified in appointing the FSLIC. In the overall statutory scheme the loss of review in state court is a trade-off for federal insurance. Congress has concluded that the interests of FSLIC's financial integrity demand that the FHLBB be able to assert its authority when it deems necessary. It has also provided for full review in federal court of whether Telegraph's financial condition justified appointment of a receiver. Thus, it is difficult to understand how Telegraph can complain that it has been denied a forum.
 
 
 23
 We note that the Ninth Circuit, presented with a similar factual situation, also has concluded that whenever the state closes an institution and the FSLIC is appointed as state receiver, section 1729(c)(2)(A)'s closing requirement is satisfied. Fidelity Savings & Loan Ass'n v. Federal Home Loan Bank Board, 689 F.2d 803, 813 (9th Cir.1982). Telegraph attempts to distinguish Fidelity by claiming that the right it seeks to assert here, the right to review the actions of state officials according to state law, was granted in Fidelity. Telegraph misreads the case. In Fidelity the state law did not explicitly grant the Commissioner the power to close a state institution. Construing the Commissioner's statutory powers broadly, however, the Fidelity court held that the power to close an association under California law was properly implied from the Commissioner's power to take possession of an association for the purpose of liquidation. Having reached this conclusion, the Fidelity court did not, as Telegraph would have us do, sit in judgment on whether the Commissioner should have initiated the closure nor did it analyze whether the procedures by which the closure was effected complied with state law.
 
 
 24
 Where, as here, the state and federal authorities cooperate to close a state institution and appoint the FSLIC receiver in an effort to minimize financial risks and prevent depositor panic, compliance with the closing precondition becomes "substantially a ceremonial formality." Fidelity Savings & Loan Ass'n v. Federal Home Loan Bank Board, 689 F.2d 803, 813 (9th Cir.1982). Thus, what Telegraph characterizes as a sham proceeding was merely the cooperative effort of state and federal authorities to protect depositors while at the same time minimizing FSLIC liability.
 
 
 25
 Yet, Telegraph has failed to show that denial of state court review deprived it of any rights. The evidence overwhelmingly establishes that Telegraph was in precarious financial condition and was continuing to decline. The evidence also establishes that Telegraph attended numerous meetings in 1979 and 1980 where Telegraph was put on notice that both state and federal officials intended to act unless its financial condition stabilized.
 
 
 26
 Telegraph apparently believes its financial situation was not sufficiently precarious to justify the appointment of a receiver. Telegraph asserts that it should have a full opportunity to challenge the appointment. We agree. And that is precisely the opportunity it had in federal court. The mere fact that its challenge to the receiver's appointment had to be framed with reference to section 1729(c)(2)'s requirements rather than by way of a challenge to the Commissioner's exercise of his state authority is not significant. Both challenges required Telegraph to establish that it was not insolvent or operating in a manner which put its depositors' money at risk. It had this opportunity in federal court and failed. Full judicial review has been granted.
 
 B. The Withdrawal Requirement
 
 27
 Section 1729(c)(2)(C) requires that "one or more of the holders of withdrawable accounts ... is unable to obtain a withdrawal of his account ...." 12 U.S.C. Sec. 1729(c)(2)(C). The district court held that this requirement had no meaning independent from subsection (A), requiring that the association be closed by or under state law, because "once an association is closed, no depositor can get his money."[5] Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp., No. 80 C 2792, slip op. at 17 (N.D.Ill. June 9, 1981).
 
 
 28
 Emphasizing that a statute must not be construed so as to render certain provisions superfluous, Telegraph challenges the district court's conclusion that subsection (C) is automatically satisfied whenever an association is closed. It asserts that Congress amended section 1729(c) to include the withdrawal requirement in order to limit FHLBB's authority to appoint the FSLIC receiver. Telegraph maintains that FHLBB's authority is triggered only in those situations where the association is in such financial distress that it lacks funds to honor withdrawal requests and an insurance payout is necessary to preserve public confidence and to prevent undue hardship on the account holders. It argues that the ruling that subsection (C) is "mere surplusage is impossible to square with the fact that this provision was added by Congress by amendment to a bill that already contained the first requirement that the association be closed by and under state law." Appellant's br. at 23.
 
 
 29
 Appellees respond that the interpretation that requirement (C) is automatically satisfied whenever an association is closed does not mean that this subsection is superfluous. They note that requirement (C) was added at the same time that requirement (A) was amended and maintain that both amendments must be construed together. Subsection (A) was amended to permit the FHLBB to appoint the FSLIC receiver whenever a receiver had been appointed by an authority other than the FHLBB and that appointment has been in effect for at least fifteen consecutive days. Under appellees' interpretation, subsection (C) has independent significance in a situation where a state commissioner takes custody of an association for the purpose of operating it. In this situation the statute permits the FHLBB to make a receivership appointment after fifteen days even though the state commissioner is still attempting to operate the association, only in the event that a depositor is unable to obtain a withdrawal. Thus, appellees believe subsection (C)'s purpose is to confine the FHLBB's intervention to situations where depositors are unable to withdraw their money despite the state commissioner's efforts to keep the institution open.
 
 
 30
 The legislative history supports appellees' construction. In discussing the amendments to subsections (A) and (C) the committee stated:
 
 
 31
 the committee amendment requires the Board to find that the shareholders are unable to obtain a withdrawal of their savings in whole or in part. The Board must also wait for at least 15 days from the time the State has appointed a receiver before the FSLIC can be appointed as receiver. This is intended to confine the use of the Board's authority to the most urgent situations and to preclude FSLIC receivership in those cases where State authorities have appointed a receiver or conservator for only a brief period.
 
 
 32
 S.Rep. No. 1263, 90th Cong., 2d Sess., reprinted in 1968 U.S.CODE CONG. & AD.NEWS 2530, 2541. These comments indicate that subsection (C)'s withdrawal requirement and subsection (A)'s fifteen-day requirement go hand in hand. Subsection (C) clearly is not superfluous.
 
 
 33
 The fact that subsection (C) is not "mere surplusage" does not mean, however, that the withdrawal requirement must have independent significance in a situation where state and federal authorities are cooperating in the closing and appointment of receiver. The withdrawal requirement, like the closure precondition, is, under the circumstances here, "substantially a ceremonial formality." Fidelity Savings & Loan Ass'n v. Federal Home Loan Bank Board, 689 F.2d 803, 813 (9th Cir.1982).
 
 
 34
 Accordingly, we agree with the district court that subsections 1729(c)(2)(A) and 1729(c)(2)(C) have been satisfied.
 
 II
 
 35
 We next consider the trial errors Telegraph assigns. The issue at trial was whether one of the grounds enumerated in 12 U.S.C. Sec. 1464(d)(6)(A) existed at the time the FSLIC was appointed. Section 1464(d)(6)(A) specifies five grounds for the appointment of a receiver. The FHLBB relied on two of these grounds: (i) insolvency and (ii) an unsafe or unsound condition to transact business. Because the more complicated issue of whether Telegraph was unsafe and unsound would never have to be considered if Telegraph was found to be insolvent, the trial judge limited the trial to the insolvency issue.
 
 
 36
 The gravamen of Telegraph's complaint is that the trial court erred in applying the statutory test of insolvency because the test, "whether it is required by the language of the Statute or not, is economically and financially irrational in application." Appellant's br. at 34 (emphasis in the original). Telegraph also contends that the statute unconstitutionally violates its property and contract rights.
 
 
 37
 Additionally, Telegraph challenges numerous trial rulings. It asserts that the trial judge unduly restricted the scope of trial by excluding the issue of whether the FHLBB reasonably rejected the Heron Proposal and by preventing discovery on FHLBB's policies and practices with respect to other state institutions. These exclusions, Telegraph contends, deprived it of the only effective means of proving that the FHLBB's application of the statutory insolvency test was arbitrary or irrational. It also contends that the trial judge did not accord Secretary Mehle's testimony the great weight to which it was entitled, or apply the correct standard of review to the constitutional challenge. Finally, it claims that the attorneys for the federal agencies should have been disqualified.
 
 
 38
 A. The Book Net Worth Standard of Insolvency
 
 
 39
 The FHLBB employed the book net worth test to determine that Telegraph was insolvent. Under this test liabilities are subtracted from assets valued at book value. The trial judge held that FHLBB's method of calculations was permissible under 12 U.S.C. Sec. 1464(d)(6)(A), which provides that insolvency is computed by subtracting "obligations to its creditors and others" from "assets of the association." Section 1464(d)(6)(A) does not specify what constitutes "obligations" or how to value "assets."
 
 
 40
 Telegraph contends that the book net worth test does not comply with section 1464(d)(6)(A) because it does not accurately evaluate an institution's financial stability. It argues that in order to conform to the statute's purpose of predicting the degree of risk to FSLIC funds, assets must be valued at fair market value and obligations should include only those liabilities currently due. Under Telegraph's definitions obligations do not include deferred taxes or deferred loan fees. Had the FHLBB defined assets and obligations as urged by Telegraph, it could not have found Telegraph insolvent on the day of the takeover.[6]
 
 
 41
 At trial Telegraph introduced statistics to support its contention that an institution's book net worth bears no relationship to its true net worth. It buttressed these statistics with the testimony of the Assistant Secretary of the Treasury for Domestic Finance, Roger W. Mehle. Mehle testified that it was his personal belief that the book net worth test of insolvency was meaningless. Based on this evidence, Telegraph insisted that the FHLBB's method of computing insolvency was "unique," "irrational" and "prejudicial."
 
 
 42
 The trial judge held that the book net worth method of evaluating an institution was valid under section 1464(d)(6)(A) and, hence, that the FHLBB's determination that Telegraph was insolvent on the day of its closure was reasonable. He noted that an agency's interpretation of a statute is entitled to a presumption of validity and emphasized that, although Congress revised section 1464(d) in 1966 and again in 1978, it has never altered the subsection granting the FHLBB authority to appoint a receiver after a determination that an institution is insolvent. The court also noted that since 1954 the FHLBB has been computing insolvency based on financial data contained in Monthly Reports which savings and loan associations prepare and file and that these reports reflect the total book value of an association's assets and its total liabilities.
 
 
 43
 The trial judge rejected Telegraph's definitions of the terms "obligations" and "assets." In so doing, he relied heavily on the testimony of Kenneth Scott, former general counsel of FHLBB. Telegraph believes that the trial judge should have placed more reliance on the testimony of Assistant Secretary Mehle. We may not, however, set aside a trial court's findings, particularly where those findings are based primarily upon the credibility of witnesses, unless those findings are clearly erroneous. Lee v. National Can Corp., 699 F.2d 932 (7th Cir.1983). While reasonable people may differ as to which witnesses were more credible, we cannot say that the trial judge's reliance on witnesses other than Mehle[7] was clearly erroneous.
 
 
 44
 Based on an analysis of testimony from witnesses on both sides, the legislative history and "generally accepted accounting principles and regulatory accounting principles," Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp., No. 80 C 2792, slip op. at 7 (N.D.Ill. Feb. 19, 1982), the trial judge held that "obligations" includes all liabilities. He emphasized that since 1954 the FHLBB has valued an association's assets at book value and that Congress had never attempted to pass a statute requiring the FHLBB to value an association's assets in a different manner. For this reason, the trial judge concluded that valuation at book value was proper. Accordingly, he held that the FHLBB's construction of section 1464(d)(6)(A) was consistent with congressional intent and the statutory language.
 
 
 45
 We believe the trial court's analysis is correct. Telegraph's assertion that the statute is "unique" or "irrational" is a legislative matter for Congress to address and is irrelevant to the resolution of this controversy. The statute requires the FHLBB to determine if an association is insolvent by subtracting its obligations from its assets. The FHLBB's definitions of "assets" and "obligations" comply with the statutory mandate. Accordingly, regardless of whether Telegraph agrees with the statutory test, it is the law and we are bound by it.
 
 
 46
 We also reject Telegraph's contention that even if the FHLBB's construction of the statute accurately reflected whether an association was insolvent in 1954 the book net worth test has since become invalid because of changes in the circumstances to which it applies. Telegraph emphasizes that in 1954, when section 1464(d)(6)(A) was drafted, most of an association's accounts were regular passbook accounts. Because these accounts were not subject to any penalty, all interest accrued was actually paid out. Thus, the book value and market value of an association's assets were approximately the same. Today, because the commonly held accounts are certificate or term accounts rather than regular passbook accounts, the book value is considerably higher than market value. While for accounting purposes the interest on these term accounts is recorded as liabilities, many of these term accounts are redeemed before their maturity dates and because of the penalty attached to early redemption, the association pays less interest than the recorded liabilities. Therefore, assuming arguendo that valuing assets at book minus total liabilities accurately reflected an association's financial stability when most of the association's accounts were regular savings accounts, Telegraph insists it does not do so when the nature of the accounts has changed.
 
 
 47
 We cannot agree. The fact that Congress has never attempted to change the method the FHLBB uses to compute insolvency is strong evidence that Congress intended insolvency to be determined by the book net worth test. Telegraph would have us redraft the statute to conform to its idea of economic policy. Our task, however, is to enforce the law as Congress saw fit to enact it.
 
 
 48
 We believe the trial judge properly concluded that the FHLBB may, consistent with the statute, compute insolvency in terms of negative net worth, based on a valuation of assets at book value. Accordingly, the FHLBB's calculations, arrived at by subtracting all liabilities from the book value of all the assets, were reasonable.[8]
 
 B. The Constitutional Challenge
 
 49
 Telegraph also challenges section 1464(d)(6)(A) on substantive due process grounds. It asserts that FHLBB's authority extends only to situations involving possible risk to FSLIC insurance funds and reasons that the receivership criteria set forth in section 1464(d)(6)(A)(i), and incorporated by section 1729(c)(2)(B), do not accurately reflect whether an institution is insolvent. Telegraph maintains that because the criteria do not indicate when FSLIC funds are at risk, appointment of the FSLIC as receiver according to these criteria violates its substantive due process rights.
 
 
 50
 In analyzing the statute's constitutionality the district court stated that the statute was not violative of substantive due process if it was rationally based and free from invidious discrimination. It concluded that the statute was not unconstitutional because application of the book net worth test is a rational means of protecting FSLIC insurance funds.
 
 
 51
 Telegraph contends the trial court should have applied a higher standard of review. Yet, although Telegraph claims the trial judge improperly relied on New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), and Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 921, 95 L.Ed. 1233 (1951), to support the application of a minimal standard of review to the constitutional challenge, it cites no authority for its contention that the rights involved in this case are property and contract rights requiring strict scrutiny. Nor does it offer any argument to refute the trial judge's conclusion that "[t]he right to do business has never been considered a fundamental right." Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp., No. 80 C 2792, slip op. at 17 (N.D.Ill. Feb. 19, 1982). Finally, Telegraph fails to explain why United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958), on which the trial judge heavily relied, does not control.
 
 
 52
 In Central Eureka Mining Co. the government ordered all non-essential gold mines closed in order to free the machines for war-related work. Central Eureka's challenge to the governmental action on substantive due process grounds failed. Applying Central Eureka Mining Co. to this case, the trial judge noted, "[i]f a substantive due process challenge to government action that effectively took control over the deployment of the assets of a business is evaluated by the rational basis test, we doubt that a stricter standard of review is warranted in this case." Telegraph Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp., No. 80 C 2792, slip op. at 18 (N.D.Ill. Feb. 19, 1982).
 
 
 53
 We agree that Central Eureka Mining Co. controls. Accordingly, the statute is properly evaluated by the rational basis test. Because we have already determined that the statutory test for insolvency may reasonably be said to reflect an association's degree of financial stability, which, in turn, reflects the degree of risk posed to FSLIC insurance funds, the statute satisfies the rational basis test.
 
 III
 
 54
 Telegraph claims that Judge Marshall erred in refusing to sever and remand the state law counts against the Commissioner. It also asserts that Judge Marshall's determination that the state claims were "part and parcel" of the federal action was contradicted by Judge Grady's later ruling that a challenge to the Commissioner's action should be litigated in state court. Telegraph maintains that these two rulings operated to deny it the right to challenge the Commissioner's ex parte state action, a right which is granted by ILL.REV.STAT. ch. 32, Sec. 852. Telegraph complains that as a result of the two contradictory rulings it has no forum in which to challenge the Commissioner's finding that there was an emergency situation justifying a takeover without prior written notice.
 
 
 55
 We find nothing contradictory in the two rulings. Judge Marshall refused to remand the claim against the Commissioner because he believed that all Telegraph's claims were part of its challenge to the FHLBB's appointment of the FSLIC as receiver and that a challenge to a federal receivership could be maintained only in federal court. Judge Grady held that review of state law questions was not part of an action to challenge a receiver under 12 U.S.C. Sec. 1729(c)(2). The fact that Judge Grady dismissed the separately pleaded state law counts without prejudice merely indicates that these claims are independent of Telegraph's challenge to a federal receivership under federal law. The dismissal cannot be read as a ruling on the validity of the state claims.
 
 
 56
 Telegraph's real complaint is that the state court judge dismissed Telegraph's second state court action because he read Judge Marshall's dismissal to mean that the state court had no jurisdiction to hear the state claims. Whether Telegraph has a state cause of action is properly left to the state court. Neither Judge Marshall's ruling nor Judge Grady's ruling is binding on the state court. Because the state court dismissal is currently on appeal we leave it for the state appellate court to determine if Telegraph has any valid state claim.
 
 
 57
 We hold that Judge Grady's ruling and Judge Marshall's ruling are not in conflict and in no way operate to deny Telegraph a forum in which to challenge the propriety of the Commissioner's action under state law.[9]
 
 IV
 
 58
 For all the reasons detailed above, the decision of the lower court is
 
 
 59
 AFFIRMED.
 
 
 
 *
 The Hon. Walter E. Hoffman, Senior Judge of the United States District Court for the Eastern District of Virginia, is sitting by designation
 
 
 [1]
 Although the Heron Corporation offered only seven million dollars for the stock, its offer was contingent on obtaining a fifteen million dollar, fifteen-year interest free loan from the FSLIC, with an option to extend the loan for five more years at six per cent interest
 
 
 [2]
 ILL.REV.STAT. ch. 32, Sec. 848, which authorizes the Commissioner to assume custody, provides that "[u]nless the Commissioner finds that an emergency exists which may result in loss to members or creditors and requires that he take custody immediately, he first shall give written notice to the directors, trustees, or liquidators specifying the conditions criticized and state a reasonable time within which correction may be made."
 
 
 [3]
 The packet of custody and receivership documents used by the Commissioner on May 22 when he assumed custody were prepared by private attorneys representing the FHLBB and the FSLIC. These documents were given to the Commissioner on March 28. A prior written notice of intent to assume custody was not included. Telegraph insists that the fact that the documents were prepared nearly two months before they were used indicates that no emergency existed. Thus, it contends that the Commissioner violated Illinois law by failing to give prior written notice
 
 
 [4]
 Although it held that the federal appointment could not be challenged under state law, the district court noted that if either the state or federal authorities violated state law, Telegraph may have an action for damages under Illinois law, ILL.REV.STAT. ch. 32, Sec. 852, or under federal law, 42 U.S.C. Sec. 1983
 
 
 [5]
 The Fidelity court reached the same conclusion
 
 
 [6]
 Telegraph had more than eleven million dollars in liquid assets at the time Bacon attempted to withdraw twenty-five dollars
 
 
 [7]
 We also have considered Telegraph's argument that Mehle's testimony reflects official Treasury policies and, thus, should be construed as admissions against the federal agencies. This argument is without merit. Since Mehle testified in an individual, rather than official, capacity his remarks cannot be imputed to the federal agencies
 
 
 [8]
 Telegraph also challenges other trial court rulings. It maintains that: (1) the issue of whether the FHLBB properly rejected the Heron Proposal should not have been excluded from trial; (2) the receivership should not be evaluated according to notions of "trends in operating losses" and "public confidence"; and (3) counsel for the federal agencies should have been disqualified. We have carefully examined these arguments and find them to be without merit
 
 
 [9]
 Telegraph also raises arguments with respect to Counts I, II, IV, VI, IX and X. Counts I and II, which were dismissed without prejudice by Judge Grady, contained state law claims against the Commissioner. Count IV alleged a Bivens action. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and a 42 U.S.C. Sec. 1983 claim. Count VI contained a charge against Schilling for misrepresentation. Count IX stated an unlawful creditor preference claim and Count X pleaded a shareholder derivative action. With the exception of the Sec. 1983 claim in Count IV, these counts were dismissed. The Sec. 1983 claim in Count IV was retained and stayed, pending resolution of the state claims in state court. We have examined Telegraph's arguments with respect to each of these counts and find them to be without merit. The district court properly dismissed all claims except the Sec. 1983 claim